MONMOUTH COUNTY ELECTRIC COMPANY

*v.*

THOMAS P. McKENNA.

[Submitted December 26th, 1904. Decided February 2d, 1905.]

A corporation executed a mortgage to H. on all its property, of every nature and description, whether then owned or thereafter acquired by it. Thereafter it orally bought a lot of M., moved a house belonging to it thereon, put a cellar under it, and placed it in condition for occupation.— *Held,* that it thereby acquired the equitable title to the lot, to which the lien of the mortgage attached, subject to the lien of M. for the purchase-money, but not subject to any lien for services rendered by him to the corporation.

On final hearing on bill, answer and proofs.

*Mr. John M. Enright,* for the complainant.

*Mr. Frank P. McDermott,* for the defendant.

PITNEY, V. C.

The complainant, the Monmouth County Electric Company, by its bill, asks an accounting from the defendant, Thomas P. McKenna, for the proceeds of the rents received from, and those

of the sale and conveyance by him of, a certain house and lot, situate on Fifth avenue, in the borough of Long Branch, in this state.

The ground of its equity is that, while the legal title of said premises rested in the defendant, the equitable title was in the complainant.

Complainant claims such title through a mortgage, executed by the Atlantic Highlands, Red Bank and Long Branch Railway Company to the Hamilton Trust Company, dated July 1st, 1895, to secure certain bonds. The particular clause in the description in that mortgage under which it claims is this, "all and singular its *property* and franchises *of every nature and description* whatsoever, *whether now owned or hereafter to be acquired.*" Further on is this language: "including particularly the following described properties;" then follows a description in general of the route of the railway.

Complainant asserts that the equitable title to the house and lot here in question was acquired by the mortgagor in the summer or early fall of the year 1897, and became at once vested in the mortgagee and subjected to the lien of the mortgage just stated. That mortgage was foreclosed by proceedings in this court, and an execution was issued to Master Terhune which contained a description in accordance with the decree, in the same verbiage as that above set forth, using this language:

"All and singular the property and franchises of the Atlantic Highlands, Red Bank and Long Branch Electric Railway Company *of every nature* and description whatsoever, *whether owned at the date of said mortgage,* on the 1st day of July, 1895, *or thereafter acquired.*"

Under that execution the master made his deed to Lindley M. Garrison, and the verbiage of that deed follows that of the execution. Mr. Garrison conveyed to the complainant by a similar description.

The bill in that foreclosure case was filed after the acquisition by the mortgagor of whatever title it ever had to the lot here in question, so that I feel constrained to hold, upon well-settled principles, that if the equitable title vested in the mortgagor, it became at once subject to the lien of the mortgage. See *Mon-*

*mouth County Electric Co.* v. *Central Railroad of New Jersey et al., 54 Atl. Rep. 140,* which seems to be a decision directly in point on the construction of this mortgage.

The complainant sustains its proof of the acquisition by the mortgagor of the equitable title by the following evidence of the then president of the old company, Mr. Adolph G. Greenberg.

He testifies, that in locating and building their route in the borough of Long Branch, they were obliged to occupy private property.

For that purpose they purchased, among others, a house and lot of a Mrs. Foster by deed, dated June 1st, 1897, for the sum of $4,500. At that time the defendant, McKenna, was acting as the attorney and counsel of the old company and assisting in the purchase of the right of way. Adjoining the Foster house on the south were two vacant lots of about one hundred by one hundred and fifty feet each. The second one from the Foster house and lot was owned by Mr. McKenna and is the one here in controversy.

The old company wished to dispose of the dwelling standing on the Foster lot, in order to make way for the tracks, and authorized Mr. McKenna to sell it for $500. This he did not succeed in doing. It then authorized him to give it away to anyone who would remove it immediately. This he did not succeed in doing.

It was then agreed between Mr. Greenberg and Mr. McKenna that the company should purchase from him his lot at the price of $1,000, and that the company should move the Foster house upon it. This was done. Mr. McKenna securing permission from the owner of the intervening lot to pass the house over it. The company incurred all the expense of moving the house, of excavating the cellar and building the foundation, and fitting the house for occupancy, and directed Mr. McKenna to rent the same, and to account for the rents thereof. This he did from time to time, including them with his account of other rents received by him from other tenements acquired by the company in that vicinity.

The building was a double tenement-house, designed for two families, and was rented to two families continuously, com-

mencing with November, 1897, at $10 a month each.  It is admitted that Mr. McKenna collected these rents until he con-. veyed away the premises, about the 1st of August, 1902, and received therefor, in cash, the sum of $2,600.

In addition to the foregoing facts it appears, by the assessment books of the township of Ocean, in which the premises are situate, that in the next year—1898—this house and lot was assessed to the old company (mortgagor), and again in 1899 to the same, and again in 1900, bills being sent in 1898 to the president, Mr. Greenberg, and in 1899 and 1900 to Mr. Degnan, the receiver.  In the years 1901 and 1902 it was assessed to the complainant and the tax paid by it.  The aggregate of the two years' taxes so paid, with interest, amounts to over $50.

The lot was also subject to taxation by the municipal authorities of the borough of Long Branch, and it seems pretty clear that Mr. McKenna discharged those taxes.  But this was a much smaller tax than that of the township.

The old company was never in a position to pay Mr. Mc-Kenna the $1,000 purchase-money for the lot in question, and finally Mr. Greenberg directed him to sell it and account to the company for the proceeds.  This he did not do.  And on the appointment of the receiver, in 1898, whatever authority to sell Mr. McKenna had under Greenberg's directions, which were oral, expired, if such authority ever was binding against the mortgagee; on this I express no opinion.

Mr. McKenna's defence to the case so made is twofold. First.  He says that the agreement between him and Greenberg was that he was to account to the company for the value of the house—$500—and the cost of moving it and setting it up on his lot, and that there was no contract on his part to convey to the company.

I have carefully compared Mr. McKenna's evidence on this part of the case with Mr. Greenberg's, and I am unable to reconcile them, or to reconcile Mr. McKenna's evidence with itself and other well-established facts in the case.

When sworn, on the same day that Mr. Greenberg was sworn, and in his presence, he admitted that there was a price fixed at $1,000 for his lot, to be paid to him by the company.  The

fixing of the price to be paid by the company for the land is quite inconsistent with the theory that there was no contract of sale from him to the company, and that the actual contract was that he was to take the house and pay for it—$500—together with the cost of removing it and setting it up.

The hearing of the case was adjourned over to enable Mr. McKenna to produce Mr. Degnan.

In the absence of Mr. Greenberg, who resides somewhere in New York, Mr. McKenna attempted on that second day to vary his previous evidence by stating that the fixing of the price of $1,000 to be paid by the company was in connection with a plan the company had, at one time, of so locating their route as to cross defendant's lot instead of Mrs. Foster's.

I think the objection taken (in time) by the counsel of the complainant to this evidence was well taken, and that I ought not to consider it. But, giving it all weight that, under the circumstances, it is entitled to have, it does not change my view of the result of Mr. Greenberg's evidence, as above stated.

He is quite clear in his recollection and statement that the offers made by him to McKenna, first, to sell the house, as it stood, at $500, the purchaser to remove it promptly, and next, to give it away to any person who would quickly remove it, were off and expired for want of acceptance before the bargain for purchase at $1,000 was made.

His evidence is inconsistent with the idea that there was any option to Mr. McKenna, viz., either to take $1,000 for the lot or to take the house at $500 and the cost of moving and erecting.

He seemed an intelligent and reliable witness and, in fact, was relied upon by both sides, and his natural sympathies were clearly with Mr. McKenna on the next defence which he sets up.

Moreover, I think that the fact that the property was assessed to the trolley company up to the time that Mr. McKenna conveyed it away is most significant. It had previously been assessed to him, and no explanation is made of how it came to be assessed to the old company. It is questionable in my mind whether the mere fact that a house was moved off of the line

of the railway on to it was sufficient notice to the assessor that the property had passed to the trolley company.

My interpretation of Mr. McKenna's evidence in connection with a batch of tax bills, which he produced, is that this property was assessed to him by the assessor of the township of Ocean for the two years which he owned it prior to 1897. He says that he did not think of the tax in the township, because the lot had been valued at only $500 or less, and he was entitled to an exemption of $5,000 by reason of his service as a mounted militiaman. But this does not account for the property being assessed in the name of the railway company at $1,500, as it undoubtedly was.

Moreover, Mr. McKenna does not deny the evidence of Mr. Greenberg, that he included the amount of the rents collected by him from this house in the general account of the rents collected by him for the company from other property of theirs.

I think, then, that a parol contract is clearly established by which Mr. McKenna agreed to convey to the old trolley company the house and lot here in question for $1,000, and that it was partly performed, or rather irretrievably acted upon by the trolley company, by moving thereon a house and expending money in establishing it, which house, when so established, was worth, by the evidence, at least $2,000, and that this action, on the part of the company, was taken on the strength of the parol contract, which is clear in all its parts, and hence it would be inequitable for Mr. McKenna to be permitted to recede from it.

Defendant's next defence is a set-off for services rendered by him to the old trolley company.

It is proven clearly that he did render services for a period of two years or more to that company, and that they were valuable. In this part of the case he is cheerfully supported by Mr. Greenberg.

He presented a bill for those services to the receiver, Mr. Degnan. Neither the original of that bill nor a copy was furnished to the court, though the hearing was adjourned to enable him to produce it from the possession of Mr. Degnan, who was within the jurisdiction of the court. He admits that he gave no credit thereon for anything arising out of the house

and lot transaction here in question. He swears that he was never notified that the bill was contested. The foreclosure sale under the mortgage and the sale to Mr. Garrison were a part of a reorganization scheme in which the creditors were to take pay partly in bonds and partly in stock of the new company; and he swears that he never received anything on his claim, and it would seem, from two letters which he produced, written by Mr. Greenberg, that the reorganization committee or the receiver was not willing to acknowledge that he was entitled to any. Be that as it may, all that appeared before me is that he rendered services as an attorney for the old company, which, if properly itemized and proven, according to the practice of this court, would amount to a considerable sum of money. It also appears that he received, during the period that he was performing those services, divers sums of money as rent from other tenants of the old company.

Now, the question on these facts is, whether, as a condition precedent, or as part of the remedy, asked for by the complainant, the defendant is entitled to have the account between him and the old company adjusted and to have credit for anything which may be found to be due to him from the old company.

The solution of that question leads us to a consideration of the precise result of the transaction as it occurred in the fall of 1897.

By well-settled and familiar equitable principles, as soon as the transaction was completed by the erection—I think I am justified in calling it—by the complainant on the lot of the defendant of the house in question, in pursuance of the contract of sale for the sum of $1,000, the complainant became the owner in equity of the lot and the debtor to defendant in the sum of $1,000, and defendant held the legal title to the premises as security for the purchase-money. He was a mortgagee of the land to secure the purchase-money. The citation of authority for this position is not necessary.

The property then passed at once under the dominion of the previously given mortgage. But the defendant was in possession, which he retained properly, as mortgagee, and was entitled

to collect the rents, but was bound to appropriate them to the reduction of the mortgage debt. This seems to me to result, logically and naturally, from the situation as I have found it.

No serious change in the situation could be affected by the immediate parties, the old trolley company and the defendant, without the consent of the mortgagee, and none was attempted, so far as I can find from the evidence, prior to the appointment of the receiver, unless it be the verbal authority alleged to have been given by President Greenberg to the defendant to sell and convey.

But this was not acted upon, and, so far as proven, I do not understand, from the evidence, that it went so far as to authorize the defendant to apply the surplus money, if any, arising from the sale towards the payment of his claim against the company for services.

It follows, as it seems to me, that the doctrine of set-off relied upon by the defendant does not reach the case.

The services rendered were rendered on the credit of the old company. There is nothing to indicate that there was any understanding, at the time that the work was being done, that Mr. McKenna was to hold the title of these premises as security for his payment therefor, and it seems to me that it was not competent for the parties to make such a contract.

Mr. McKenna held the title to the property as mortgagee to secure the $1,000. To that extent his mortgage was prior to the mortgage of the trust company, but he could not annex, or, as the old lawyers expressed it, "tack" to that mortgage an additional lien for services rendered, and thereby cut out the intervening right of the bondholders secured by the mortgage to the trust company.

His remedy was that of every mortgagee, viz., a suit for foreclosure.

Upon reflection, I find nothing inequitable or unjust in this result. Mr. McKenna is clearly chargeable with two matters, one of fact and one of law. He is chargeable with notice of the existence of the mortgage and of its contents, and he is chargeable with notice of the effect in law, or rather in equity, of a transaction such as he entered into with the company; and he

is further chargeable with knowledge of the fact, which was admitted at the hearing and must have been notorious among the employes of the company, that this road was being built with the proceeds of the sale of its mortgage bonds. He knew, or ought to have known, that the valuable house, which, according to the evidence, was worth $2,000, when erected on his lot, was paid for out of the money of the bondholders; that before it was moved from the Foster lot it was clearly subject to their mortgage, and that the cost of erecting it on his lot was borne by the bondholders. Looked at in that light, it seems to me that the clear equity of the case is with the complainant.

For these reasons I shall advise a decree that Mr. McKenna must account to the complainant for the price which he received for the house and the rents which he received during the five years which he collected them, and be credited with the $1,000 · of purchase-money and such taxes as he can show that he has paid, if any, and also the repairs. If the parties cannot agree upon the amount there must be a reference to a master.